# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### GREEN BAY DIVISION

**LATASHA DAWSON,** and
**MARY MANNEH**

        Plaintiffs,

vs.                              Case No. 1:19-CV-370

**PRIME CARE SERVICES, LLC,** and
**MUSTAPHA SUNO,**

        Defendants.

---

## DEFENDANTS' *AMENDED* MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, Prime Care Services, LLC ("Prime Care"), and Mustapha Suno ("Suno"; collectively, Prime Care and Suno may be referred to as "Defendants"), by their attorneys, Dempsey Law Firm, LLP, present this Memorandum in support of their Motion for Summary Judgment.

### INTRODUCTION

Latasha Dawson ("Dawson") and Mary Manneh ("Manneh"; collectively Dawson and Manneh may be referred to as "Plaintiffs") brought action against the Defendants under various legal theories claiming, essentially, that they were not properly paid.   Frankly they were right, but not for the reasons they stated.

Plaintiffs' case seeks unpaid overtime wages.  Unfortunately for them, they were exempt from overtime as a result of their position with Prime Care. They were, however, entitled to their base salary regardless of hours worked.  For each Plaintiff, there was a minor error by the paycheck company on the very few pay periods that Plaintiffs worked less than forty hours.  Prime Care sought to correct that error, sending them payment for the amount they should have been paid,

doubled, for Prime Care's error. Plaintiffs have refused the payment and returned the same to Defendants.

This case comes down to a few simple issues for the Court to determine:

- Were the Plaintiffs exempt from overtime (they were);

- Did the Plaintiffs receive the proper amount of payment for their services to Prime Care (they did not);

- Have the Plaintiffs diligently prosecuted this case (they have not); and

- What should the Court do with this case which has been pending for some time?

It is Defendants' position that the Plaintiffs should be paid for the amount they agreed to. Defendants believe that Prime Care *should* issue checks to the Plaintiffs consistent with their agreement because of the the error of the paycheck company. However, any more than that is simply unwarranted given the undisputed facts of this case. Moreover, as the Plaintiffs are not participating in this matter, such a result is all-the-more appropriate.

## STATEMENT OF RELEVANT FACTS

*The Employment Relationship*

Prime Care Services, LLC ("Prime Care") is an assisted living business that manages homes for adults that are unable to adequately care for themselves. (Statement of Proposed Undisputed Material Facts[1], ¶¶ 2, 4.) Mustapha Suno ("Suno"; Prime Care and Suno may be collectively referred to as "Defendants") has been the managing member of Prime Care since its organization in 2016. (Facts, ¶¶ 1, 3.) Prime Care hired Latasha Dawson ("Dawson") and Marry Manneh ("Manneh"; Dawson and Manneh may be collectively referred to as "Plaintiffs") as Resident Care Professionals with a starting hourly wage of $11.00 per hour. (Facts, ¶¶ 5-6, 9-10.) In 2018, Plaintiffs were promoted to the position of House Manager. (Facts, ¶¶ 7, 11.) Plaintiffs were promoted to the position of House Manager because both sought more responsibility, pay, and advancement. (Facts,

¶ 17.) The promotion accomplished all of those things as it increased Plaintiffs' base compensation and gave them additional responsibilities of House Managers. (Id.)

Generally[2], the duties of a Resident Care Professional include individual responsibility for supervising and caring for the residents of Prime Care's homes, responsibility as a member of a team to keep the homes clean, and a duty to report certain issues to the House Manager. (Facts, ¶ 13.) The duties of a House Manager[3] include: assistance with management of staff and the day-to-day operations of the Prime Care homes, community involvement, group home operations, consumer rights and care, regulatory compliance, staff training, consumer life enrichment, personal care, providing recommendations for hiring and firing, staff direction, staff evaluation, financial management, and the scheduling of shifts for subordinate employees and for themselves. (Facts, ¶¶ 14-16.)

On February 1st, 2019 and February 2nd, 2019, Dawson and then Manneh resigned from their positions at Prime Care. (Facts, ¶¶ 8, 12.) Defendants believe that Plaintiffs' true reason for resigning from their positions at Prime Care is that they wished to avoid consequences related to an agency investigation into Plaintiffs' mischaracterizations, embellishments, and lies related to many events that occurred in the homes they managed. (Facts, ¶ 23.) On March 13th, 2019, Plaintiffs filed suit alleging that Prime Care failed to pay Plaintiffs overtime wages. (Facts, ¶ 26.)

Defendants contend that Plaintiffs were properly classified as salaried workers exempt from overtime. Plaintiffs both had a starting annual salary of $27,560 for their employment as House Managers with Prime Care (Facts, ¶ 24.) Plaintiffs exercised their authority to schedule shifts to schedule themselves to work in excess of 40 hours per week; they were not required – or even asked – to work overtime. (Facts, ¶ 19.) Plaintiffs management related duties accounted for more than half

---

[1] For simplicity, future references to the Statement of Proposed Undisputed Material Facts will be "Facts, ¶ #."

of their time, with the balance of their time as House Managers involved care related duties that overlap with the duties of the Resident Care Professional. (Facts, ¶ 18.) Plaintiffs each had three to five Resident Care Professionals directly reporting to them at any time during their employment as House Managers. (Facts, ¶ 20.) For the entirety of Dawson and Manneh's employment as House Managers, Plaintiffs reported directly to Suno as Suno had not yet created a middle manager position. (Facts, ¶ 21.) The House Managers at Prime Care have significant levels of autonomy and are subject to minimal levels of physical supervision. (Facts, ¶ 22.) Suno rarely supervises the House Managers in person and instead predominately supervises the House Managers by checking in with them via email or phone. (Id.)

<em>Discovery of Inadvertent Underpayment</em>

Aside from the erroneous underpayments attributable to Prime Care's payroll company (*infra*), all amounts due and owing to Plaintiffs' – including their standard salary plus their bonus pay – was paid in full by Prime Care. (Facts, ¶ 25) Prime Care thought that *all* amounts due and owing to Plaintiffs had been paid in full.  Unfortunately, as part of the disclosures in this action, on December 20th, 2019, Defendants discovered that Prime Care's payroll company erroneously underpaid Plaintiffs on a very small number of pay periods. (Facts, ¶ 28.)  Specifically, on the less than a handful of weeks when the Plaintiffs did not work full time hours, the payroll company paid them for the actual hours worked rather than the agreed upon salary. Upon realizing this payroll error, Defendants immediately issued checks to Dawson in the amounts of $326.23 and $322.15, and to Manneh in the amounts of $1,381.77 and $1,458.00. (Id.) Defendants were clear that these checks were not given by way of settlement or resolution of any claims involved in this matter. (Id.) Despite those clear statements, on January 13, 2020, Plaintiffs' counsel returned the checks issued by

---

[2] The Job Description for the position of Resident Care Professional with Prime Care lists the duties in greater detail and accounts for the possibility of additional duties as delegated by the House Manager.

[3] The Job Description for the position of House Manager lists the duties in greater detail.

Defendants. (Facts, ¶ 29.) Defendants remain willing to reissue the December 20, 2019 checks as the Plaintiffs earned that money and it is rightfully theirs. (Facts, ¶ 30.)

*Unexplained Delay and Lack of Diligence*

For over seven months, Defendants have been unwilling to provide dates to schedule in-person depositions. On November 4th, 2020, Defendants' counsel reached out to Plaintiffs' counsel regarding the Defendants' availability for depositions. (Facts, ¶ 31.) On November 23rd, 2020, Plaintiffs' counsel responded that Plaintiffs were not comfortable appearing for in-person depositions. (Facts, ¶ 32.) In a series of emails between Plaintiffs' counsel and Defendants' counsel from December 3rd, 2020, to December 17th, 2020, the Parties discovered that they could not agree to hold in-person depositions at that time. (Facts, ¶ 33.) The parties temporary resolved the issue by filing a Joint Stipulation and Order to Modify the Scheduling Order to give Plaintiffs more time for COVID conditions to improve so that Plaintiffs are willing to attend an in-person deposition. (Id.) On May 10th, 2021 – after more widespread distribution of the COVID-19 vaccine had occurred – Defendants' counsel again reached out to Plaintiffs' counsel to see if Plaintiffs were now willing to sit for depositions. (Facts, ¶ 34.) On June 5, 2021, Plaintiffs' counsel responded to the May 10th, 2021, email with "We will discuss with our clients and get back to you ASAP." (Facts, ¶ 35.) As of the date of filing this motion, Plaintiffs' counsel has not responded regarding the Plaintiffs' willingness to sit for depositions. (Facts, ¶ 36.)

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The primary purpose of summary judgment is to avoid trial where there is no genuine issue of material fact in dispute. See Trautvetter v. Quick, 916 F.2d 1140, 1147 (7th Cir. 1990). "Material facts" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a

reasonable finder of fact could find in favor of the nonmoving party. See <u>Anderson v. Liberty</u>

<u>Lobby, Inc</u>., 477 U.S. 242, 016 S.Ct. 2505 (1986).

A party opposing summary judgment may not rest upon the mere allegations or denials of

the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue

for trial. Fed. R. Civ. P. 56(e).

## ARGUMENT

Plaintiffs' claims for unpaid overtime are without merit because Plaintiffs are exempt from

the overtime provisions of the FLSA and the Wisconsin Administrative Code. Ultimately, there are

no genuine issues of material fact and the Defendants are entitled to summary judgment as a matter

of law. Alternatively, the Court should dismiss these claims with prejudice due to Plaintiffs' failure to

prosecute their case.

## A. Plaintiffs' claims for unpaid overtime are without merit because Plaintiffs are exempt from the overtime provisions of the FLSA and the Wisconsin Administrative Code

The FLSA entitles employees to overtime pay at a rate of one and one-half times the regular

rate of pay for any hours worked in excess of forty hours per week unless an exemption applies. 29

U.S.C.A. §§ 207, 213. One such exemption includes employees who are employed in a "bona fide

executive, administrative, or professional capacity." 29 U.S.C.A. § 213(a)(1). The Secretary of Labor

has issued regulations defining the exemption for an "employee employed in a bona fide executive

capacity" as:

> Any employee (1) compensated at a rate of not less than [$455.00]
> per week . . . exclusive of board, lodging or other facilities; (2) whose
> primary duty is management of the enterprise in which the employee
> is employed or of a customarily recognized department or
> subdivision thereof; (3) who customarily and regularly directs the
> work of two or more other employees; and (4) who has the authority
> to hire or fire other employees or whose suggestions and
> recommendations as to the hiring, firing, advancement, promotion or
> any other change of status of other employees are given particular
> weight.

29 C.F.R. § 541.100(a). Prior to January 1st, 2020, the weekly rate of pay required by 29 C.F.R. § 541.100(a)(1) was $455 per week. "Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees," 69 FR 22122-01 (April 23, 2004)[4].

Wisconsin law similarly requires employers to pay an overtime wage of one and one-half times the regular rate of pay for all hours worked in excess of 40 hours per week. Wis. Admin. Code DWD § 274.03. Wisconsin law also provides exemptions from the overtime pay requirements of DWD § 274.03 for employees employed in executive, administrative, or professional capacity. Wis. Admin. Code DWD § 274.04(1). Wisconsin's exemption specifically states that "these exemptions shall be interpreted in such a manner as to be consistent with the Federal Fair Labor Standards Act and the Code of Federal Regulations . . ." Wis. Admin. Code DWD § 274.04.

*Prong One – Minimum Rate of Compensation*

Plaintiffs clearly meet the minimum rate of compensation for the executive exemption because they were compensated at a rate that exceeded the regulatory minimum rate. The Department of Labor regulation in effect prior to January 1st, 2020, required that employees employed in a *bona fide* executive capacity be compensated at a rate not less than $455.00 per week. (29 C.F.R. § 541.100(a)(1), eff. April 23, 2004) Here, Plaintiffs were both paid a starting annual salary of $27,560.00 for their employment as House Managers with Prime Care. (Facts, ¶ 24.) When converted to a weekly rate of pay, $27,560.00 annually is the equivalent of $528.55 per week. Because Plaintiffs were compensated at a rate that is the equivalent to $528.55, and $528.55 weekly exceeds $455.00 weekly, Plaintiffs clearly meet the minimum rate of compensation to qualify for the executive exemption.

*Prong Two – Primary Duty of Management of a*

---

[4] Note that, effective January 1, 2020, the weekly salary amount was increased to an amount of not less than $684.00 per week pursuant to 29 CFR 541.100(a)(1). Neither Plaintiffs worked for Prime Care after that date.

The Department of Labor regulation defining the executive exemption requires that the employee's primary duty be management of the enterprise or a customarily recognized department or subdivision thereof. 29 C.F.R. § 541.100(a)(2). Management is generally defined as activities including, but not limited to:

> Activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; . . . appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; . . . providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The DOL regulation defines "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Relevant factors considered when determining the primary duty of an employee include: (1) the relative importance of the exempt duties compared with other types of duties; (2) the amount of time spent performing exempt work; and (3) the employee's relative freedom from direct supervision. Id. Additionally, DOL regulations clarify that the amount of time spent performing management related work is not the sole test and that nothing in the regulations require that exempt employees spend more than 50 percent of their time performing management related work. 29 C.F.R. § 541.700(b). The DOL illustrates the application of these factors with the following example:

> Assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised

and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(c).

Here, Plaintiffs primary duty as House Managers is the management of their assigned Prime Care houses which are subdivisions of Prime Care's overall assisted living business. (Facts, ¶ 4.) Each Prime Care house contains at least three subordinate employees that report directly to the House Managers. (Facts, ¶ 20.) The House Manager position is responsible for a multitude of management related duties. Specifically, the House Managers are responsible for: regulatory compliance, training employees, providing recommendations for staff hiring and firing decisions, directing employees, employee evaluations, financial management for the house they manage, and the scheduling of shifts for subordinate employees and for themselves. (Facts. ¶¶ 14-16.) In addition to those management related duties, the House Manager does spend time performing non-management related duties, specifically caring for the residents of the Prime Care homes. (Facts, ¶¶ 14, 18.) Irrespective of the time allocated to management related duties, Plaintiffs clearly meet the requirements of this prong because of the relative importance of their exempt duties, their relative freedom from direct supervision, and the relationship between the employee's salary and the wages paid to other employees for the non-management related duties also performed by Plaintiffs.

Plaintiffs' management related duties are extremely important for Prime Care's overall business. Apart from the managing member, Suno, the House Managers had the greatest level of authority and responsibility of any employee of Prime Care during Plaintiffs tenure. During the period of Plaintiffs employment, Prime Care operated with a two-level structure. (Facts, ¶ 21.) First, there is the corporate level operated solely by Suno who manages Prime Care's relationships without outside agencies in order to acquire contracts for Prime Care to provide management for assisted living homes. Second, there are the individual Prime Care homes which are each managed by a House Manager who is responsible for the overall management of the home and supervision of the

numerous Resident Care Professionals that perform individualized care services to residents. The House Managers are the only layer of management between the care providers and the head executive of the entire company. Without the House Managers, Suno's time would be preoccupied with managing day-to-day operations instead of observing corporate formalities, managing relationships with agencies and vendors, and growing the company. Clearly the House Managers assumption of the day-to-day management duties are of profound importance to Prime Care's overall business because they free up the head executive's time to focus on the general performance and growth of the business.

The House Managers are subject to a significantly diminished level of direct supervision compared to the Resident Care Professionals. Where the Resident Care Professionals are supervised directly and physically by the House Managers on a daily basis, the House Managers have a significant level of autonomy. The House Managers reported only to Suno during Plaintiffs' employment with Prime Care. (Facts, ¶ 21.) During Plaintiffs' employment with Prime Care, Suno was rarely physically present at the Prime Care homes and preferred to supervise the House Managers remotely via email or phone. (Facts, ¶ 22.) Furthermore, the House Managers have the benefit of setting their own schedule and less demanding work than the Resident Care Professionals who spend nearly all of their time directly caring for the residents of the Prime Care homes. Perhaps the House Managers had been given too great a level of autonomy because the lack of direct supervision may have led to the alleged misconduct by Plaintiffs that resulted in an agency investigation into Plaintiffs actions and prompted Plaintiffs' resignations. (Facts. ¶ 23.)

Given the foregoing, Plaintiffs' clearly satisfy this prong of "executive" because Plaintiffs' exempt duties are extremely important for the overall business, Plaintiffs' were not closely supervised, and Plaintiffs were paid significantly more than the Resident Care Professionals despite greater flexibility in scheduling and less physically demanding work.

*Prongs Three and Four – Regular Direction of Two or More Other Employees and Hiring and Firing Recommendations that are Given Significant Weight*

Plaintiffs' were responsible for the regular direction of other employees and for making recommendations for the hiring and firing of the Resident Care Professionals that reported to them. Specifically, Plaintiffs' duties included: assistance with management of staff and the day-to-day operations of the Prime Care homes, training staff, making recommendations for staff hiring and firing, directing staff, evaluating staff, and scheduling shifts for subordinate employees and for themselves. (Facts, ¶¶ 14-16.) At all times during Plaintiffs' employment as House Managers for Prime Care, Plaintiffs' each had at least three subordinate employees that they directed. (Facts, ¶ 20.) It is hard to imagine Suno not giving the House Managers input on hiring and firing decisions significant weight because of Suno's lack of physical supervision of the House Managers and Resident Care Professionals and the fact that the House Managers are responsible for all duties related to the training, evaluation, and scheduling of the Resident Care Professionals.

As detailed above, Plaintiffs are properly classified as employees employed in a *bona fide* executive capacity and are exempt from the overtime provision of the FLSA and the Wisconsin Administrative Code. Because Plaintiffs are exempt from the overtime provisions of the FLSA and the Wisconsin Administrative Code, Plaintiffs' claims for unpaid overtime are without merit and therefore Defendants Motion for Summary Judgment dismissing all claims should be granted.

*Conclusion*

Overtime is not available to "employee[s] employed in a *bona fide* executive capacity" – such as Plaintiffs – because (a) they were compensated in excess of $455.00 per week, (b) their primary duty was management of the Prime Care homes they operated out of, (c) they customarily and regularly directed three or more employees, and (d) their hiring, firing, and other employment recommendations were given substantial weight due to their day-to-day, hands-on, relationship with

their staff. For all of these reasons, as a matter of law, Plaintiffs are not entitled to the overtime compensation their suit seeks.

**B. Plaintiffs' claims should be dismissed for Plaintiffs' failure to prosecute their case**

It is the plaintiff's burden to move their case to trial. Federal Rule of Civil Procedure 41(b) provides that, "if the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." A court should only dismiss a case under Rule 41 "when there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailing." Webber v. Eye Corp., 721 F.2d 1067, 1069 (7th Cir. 1983).

Here, Plaintiffs have failed to cooperate during the discovery process and – with the summary judgment deadline at hand – Defendants simply can no longer wait. Without question, there has been a substantial delay in scheduling depositions.[5] For over seven months, Defendants have been trying to schedule the Plaintiffs for depositions. (Facts ¶¶ 31-35.) Initially, Defendants were willing to stipulate to give Plaintiffs more time for conditions to improve so that Plaintiffs would be willing to attend an in-person deposition. (Facts ¶ 33.) However, when Defendants' counsel reached out to Plaintiffs' counsel in May to see if Plaintiffs were now willing to sit for depositions, Plaintiffs' counsel did not respond for nearly a month. (Facts ¶¶ 34-35.) Then, when Plaintiffs' counsel finally responded with "we will discuss with our clients and get back to you ASAP," Plaintiffs' counsel never followed up with their availability. (Facts ¶¶ 35-36.) To this day, Defendants still have no idea if Plaintiffs will ever be available to sit for depositions nor the reason for their delay.

---

[5] Defendants recognize that during the pandemic the Plaintiffs desire to avoid in-person contact was unobjectionable and, therefore, the parties did extend deadlines accordingly in an effort to work together. However, given the widespread availability of the vaccine over the last few months, there is no longer a valid reason to avoid depositions or refuse to provide dates therefor.

Given the foregoing, the Court certainly may dismiss this case for lack of prosecution because Plaintiffs have clearly neglected their duty to move their claims to trial through their persistent refusal to sit for depositions, or at a minimum, communicate the reasons for their delay. That being said – and as further proof of the reasonableness of Defendants' request in this case – Defendants do not seek dismissal completely. Defendants still contend that Plaintiffs are entitled to the checks previously delivered to them and, if so ordered, the Defendants will re-issue the checks to the Plaintiffs for the few hours they were not paid for, doubled, as a result of the error of Prime Care's agent.

## CONCLUSION

Defendants request that the Court issue an order requiring Defendants to re-issue the December 20th, 2019, checks to Plaintiffs in order to cure the payroll company's erroneous underpayments to Plaintiffs. The Plaintiffs earned that money and it is rightfully theirs.

However, the overtime claims presented by the Plaintiffs are without merit. Plaintiffs are exempt from the overtime provisions of the FLSA and the Wisconsin Administrative Code. Alternatively, Plaintiffs' remaining claims should be dismissed due to their persistent failure to prosecute their case. Defendants respectfully request that the Court grant their motion for summary judgment, declare, if the Court deems it appropriate, that the checks previously issued to the Plaintiffs be re-issued, and dismiss all of the Plaintiff's claims against them as there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law.

Dated at Oshkosh, Wisconsin this 20th day of July, 2021.

**DEMPSEY LAW FIRM, LLP**
Attorneys for Defendants

By   *s/ Electronically Signed by Heath G. Mynsberge*
      Heath G. Mynsberge
      Member No. 1079827

**FIRM ADDRESS:**

210 North Main Street
P. O. Box 886
Oshkosh, WI 54903-0886
Phone: (920) 235-7300
Fax: (920) 235-2011
Email:
hgm@dempseylaw.com